UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------X
UNITED STATES OF AMERICA      :
     :
    -against-      :
     :      22-CR-409 (HG)
VADIM YERMOLENKO      :
     :
    Defendant.      :
-----------------------------------------------------X


REPLY IN SUPPORT OF
MR. YERMOLENKO'S MOTION TO SUPPRESS


Nora K. Hirozawa
James Darrow
Attorneys for Vadim Yermolenko
Federal Defenders of New York, Inc.
One Pierrepont Plaza, 16th Floor
Brooklyn, NY 11201

TO:   Breon Peace, Esq.
     United States Attorney
     Eastern District of New York
     Attn:    AUSA Artie McConnell
           AUSA Matthew Skurnik
           AUSA Andrew Reich

# TABLE OF CONTENTS

TABLE OF AUTHORITIES

I.      Introduction…………………………………………………………..…….…..1

II.     An evidentiary hearing is required ...…………………………………………….2

    a.   Undisputed facts…………………………………………………………....2

    b.   Disputed facts…………………………..………………………………....3

III.    The two Samsung cell phones were illegally seized from Mr. Yermolenko's home................4

    a.   The agents lacked authority to enter Mr. Yermolenko's home..............................4

    b.   Even if the Court were to find the agents had authority to enter the home for Mr. Yermolenko to change clothing, the "protective sweep" exceeded any limited authority …………..............................................................................................5

    c.   The plain view exception does not apply to the two Samsung cell phones……………..6

IV.     Mr. Yermolenko's consent to search the three cell phones was not valid because it was tained by the illegal search and seizure and was not knowing and voluntary. ………….…...9

    a.   Mr. Yermolenko's purported consent was not voluntary and was tainted by the agents' illegal search of his home and illegal seizure of the two Samsung phones ...………......9

    b.   The forensic search of the cell phones exceeded the scope of any consent…………………………………………………………………………10

V.      The inevitable discovery doctrine does not apply because the scope of the consent search far exceeded any probable cause supporting a hypothetical search warrant that the government declined to obtain……………………………………………………………………12

VI.     Mr. Yermolenko's post-arrest statements should be suppressed. ………………….………13

VII.    The government fails to address the iCloud warrant's fatal overbreadth and lack of particularity, which a reasonable agent could not have relied upon in good faith….……….15

VIII.   CONCLUSION …………………….....…………………………….………….………17

# TABLE OF AUTHORITIES

*Carpenter v. United States*, 3585 U.S. 296 (2018) …………….…………………............................7

*Doody v. Ryan*, 649 F.3d 986 (9th Cir. 2011) …………….………………....…………………14

*Ferguson v. City of Charleston*, 532 U.S. 67 (2001) …………….…………………….......................10

*Florida v. Jimeno*, 500 U.S. 248 (1990) …………….…...…………………….............................11

*Guest v. Leis*, 255 F.3d 325 (6th Cir. 2001) …………….…...……………….......................16

*In re Terrorist Bombings of U.S. Embassies in E. Afr.*, 552 F.3d 157 (2d Cir. 2008) …………………….2

*Minnesota v. Dickerson*, 508 U.S. 366 (1993). …………….…...…………………......................6

*Missouri v. Seibert*, 542 U.S. 600 (2004) …………….…...……………………….…....10, 14, 15

*Murray v. United States,* 487 U.S. 533 (1988) …………….…...…………….......................9

*Riley v. California*, 573 U.S. 373 (2014)…………….…………………………….…...1, 7, 12

*Ross v. State*, 45 So. 3d 403 (Fla. 2010) …………….…...……………….….......…………14

*Rozzo v. State*, 75 So. 3d 409 (Fla. Dist. Ct. App. 2011) …………….……………...............…………9

*State v. O.D.A.-C.*, 250 N.J. 408, 273 A.3d 413 (2022) …………….……………...…………………14

*United States v. Babilonia*, 854 F.3d 163, 179–80 (2d Cir. 2017) …………….……………………......8

*United States v. Barone*, 721 F. Supp. 2d 261 (S.D.N.Y. 2010) …………….……………………......4, 9

*United States v. Butler*, No. 3:16 CR 123 (AWT), 2017 WL 4150466
(D. Conn. Sept. 19, 2017) …………….…………………….….....................................................5, 10

*United States v. Cabassa*, 62 F.3d 470, 472-73 (2d Cir. 1995) …………….…...……………….…....13

*United States v. Capers*, 627 F.3d 470 (2d Cir. 2010) …………….……………….…...….…14, 15

*United States v. Delva*, 13 F.Supp.3d 269, 276 (S.D.N.Y. 2014)…………….…...….............................7

*United States v. Eng*, 971 F.2d 854, 859 (2d Cir. 1992) …………….……………….…...12

*United States v. Galpin*, 720 F.3d 436 (2d Cir. 2013) …………….…...……………….……16

*United States v. Gandia,* 424 F.3d 255 (2d Cir. 2005) …………………..……………………….…...10

*United States v. Goodrich*, 183 F. Supp. 2d 135, 145 (D. Mass. 2001) ………………..…………...……9

*United States v. Heath,* 455 F.3d 52 (2d Cir. 2006) ………………..……………..………………...12

*United States v. Hill,* 459 F.3d 966 (9th Cir. 2006) …………………..……………..………………...16

*United States v. Isiofia,* No. 02 CR. 520 (HB), 2003 WL 21018853, (S.D.N.Y. May 5, 2003), *aff'd*, 370 F.3d 226 (2d Cir. 2004) ………………..……………………………………………...5, 9, 10

*United States v. Ivezaj,* 568 F.3d 88 (2d Cir. 2009) …………………..……………………........ 6

*United States v. Kirk Tang Yuk*, 885 F.3d 57, 77 (2d Cir. 2018) ………………..…………………..2, 8

*United States v. Kiyuyung*, 171 F.3d 78 (2d Cir. 1999) …………………..…………………...1, 6, 7

*United States v. Lauria,* 70 F.4th 106, 128 (2d Cir. 2023) ………………..……………..……..........7

*United States v. Miller,* 430 F.3d 93 (2d Cir. 2005) ………………..…………………….................5

*United States v. Moran Vargas,* 376 F.3d 112 (2d Cir. 2004) ………………..………………….......5, 6

*United States v. Murphy,* 16 F. Supp. 2d 397, 399 (S.D.N.Y. 1998) ………………..…………........ 6

*United States v. Oguns,* 921 F.2d 442 (2d Cir.1990) …………………..……………………………9

*United States v. Palomino-Chavez,* 761 F. App'x 637 (7th Cir. 2019) ………………..…………………10

*United States v. Parson*, 599 F.Supp.2d 592 (W.D. Pa. 2009) ………………..……………………10

*United States v. Rudaj*, 390 F.Supp.2d  395, 398 (S.D.N.Y. 2005) ………………..………….......... 6, 7

*United States v. Santos*, No. 23-CR-436 (OEM), 2024 WL 3566983 (E.D.N.Y. July 29, 2024)................ 7

*United States v. Shipp*, 392 F. Supp. 3d 300 (E.D.N.Y 2019) ………..………………….....................16

*United States v. Smith*, No. 15-cr-466 (ILG), 2016 WL 3144601, at *1 (E.D.N.Y. June 3, 2016) .......... 6

*United States v. Stewart,* 536 F.3d 714, 719 (7th Cir. 2008) ………………..……………………14

*United States v. Stokes*, 733 F.3d 438, 444 (2d Cir. 2013) …………………..……………………12

*United States v. Townsend*, No. 15-CR-545 (DLI), 2016 WL 3562055, at *3 (E.D.N.Y. June 23, 2016)…………………………………………………………….........2

## I.    Introduction

Government agents declined to seek a search warrant for Mr. Yermolenko's home, did not request consent to search the home, and after seizing three cell phones—two, illegally[1]—they chose not to seek a search warrant to conduct forensic searches of those phones, despite the Supreme Court's clear directive in *Riley v. California*, 573 U.S. 373, 382 (2014). The government asks the Court to ignore these compounded Fourth Amendment violations because Mr. Yermolenko signed a written consent form that was presented to him as "administrative."

The government bears the burden of showing that "the[se] search[es] fell within one of the exceptions to the warrant requirement is on the government." *United States v. Kiyuyung*, 171 F.3d 78, 83 (2d Cir. 1999). To that end, the government had submitted exhibits related to the recorded post-arrest interrogation and proffered various facts that give rise to material factual disputes. However, the government did not submit any declarations or other evidence to support their proffer regarding the circumstances of Mr. Yermolenko's arrest and the search of his home (e.g. body worn camera footage, photographs, reports of investigation, inventory logs, or other contemporaneous documents).

Because the Court must resolve these factual disputes before ruling on Mr. Yermolenko's motion, an evidentiary hearing is necessary. Additionally, because the government failed to meaningfully address the probable cause, overbreadth, and particularity arguments raised in Mr. Yermolenko's motion challenging the iCloud search warrant, the Court should suppress the fruits of the search of his iCloud account.

## II.    An evidentiary hearing is required.

An evidentiary hearing is required "if the moving papers are sufficiently definite, specific, detailed, and nonconjectural to enable the court to conclude that contested issues of fact going to the

---

[1] Mr. Yermolenko does not dispute that agents properly seized the cell phone in his pocket pursuant to a valid search incident to arrest.

validity of the search are in question." *In re Terrorist Bombings of U.S. Embassies in E. Afr.*, 552 F.3d 157, 165 (2d Cir. 2008); *United States v. Kirk Tang Yuk*, 885 F.3d 57, 77 (2d Cir. 2018)**.** As the Court is aware, counsel's statements in a brief are not evidence. *See United States v. Townsend*, No. 15-CR-545 (DLI), 2016 WL 3562055, at *3 (E.D.N.Y. June 23, 2016).

### a. Undisputed facts.

A number of facts are undisputed. It is undisputed that armed law enforcement agents arrived at Mr. Yermolenko's home in Upper Saddle River, New Jersey at approximately 6:00 a.m. on December 13, 2022. The agents had an arrest warrant for Mr. Yermolenko, but did not have a search warrant. The only people inside the home at the time were Mr. Yermolenko, his wife Diana, their five and nine-year-old daughters, and their three-month-old baby. Approximately four armed agents, including one carrying a ballistics shield, approached and knocked on Mr. Yermolenko's door.[2]

The agents ordered Mr. Yermolenko to step outside. Mr. Yermolenko was immediately cooperative and stepped outside the home with his hands up, as directed by agents. He was patted down and promptly handcuffed. Mr. Yermolenko was wearing shorts and an undershirt. The agents seized a cell phone from his shorts pocket. The government does not dispute that Mr. Yermolenko was in custody from this point onwards.

After being handcuffed, Mr. Yermolenko asked to change clothing and use the restroom. The agents then led him back inside his home. Neither Mr. Yermolenko nor his wife consented to a search of the home at any point. The agents remained inside Mr. Yermolenko's home for approximately 30 minutes. They conducted a "protective sweep" of "the premises"—the government does not dispute that the areas searched included the master bedroom, living room, kitchen, basement, and two upstairs

---

[2] The government does not indicate whether they dispute that approximately 10 agents, total, were present and does not state how many agents entered Mr. Yermolenko's home or how many agents were involved in the "protective sweep."

bedrooms. The agents did not read Mr. Yermolenko his *Miranda* rights at any point inside his home or during transport.

The agents presented Mr. Yermolenko with a *Miranda* waiver form and consent to search form only after transporting him to an interrogation room in Staten Island. The agents did not read him his rights or confirm his understanding of those rights. Mr. Yermolenko signed both forms.

### b. Disputed facts.

But certain critical facts are in dispute. Mr. Yermolenko submitted a declaration in support of the facts set forth in his motions. The government proceeded by proffer. A non-exhaustive list of material disputes requiring an evidentiary hearing is included below:

- Which cell phone was seized from Mr. Yermolenko's pocket—iPhone or Samsung?
- Was a cell phone seized from the desk in an upstairs bedroom or a nightstand in the master bedroom?
- How many agents, total, were present at the home?
- Did the agents or Mr. Yermolenko ask to retrieve the passports from the bedroom closet?
- Did Mr. Yermolenko consent to the seizure of the two Samsung cell phones?
- Did any substantive conversation take place before the interrogation room?
- Did the agents elicit any incriminating information before providing Mr. Yermolenko with the *Miranda* waiver form?

These questions are material to resolution of Mr. Yermolenko's suppression motion and require the Court to receive testimony, or else reject the government's unsworn assertions. For example, the government contends—based on unsworn information from an uncited source—that one of the two Samsung cell phones was seized from Mr. Yermolenko's pocket. Notably, the government does not specify *which* Samsung cell phone was in his pocket. The government also claims that one cell phone was observed on a nightstand in the master bedroom; but again, the government does not specify *which* cell phone. These omissions stand in stark contrast to the careful, standardized records trained FBI agents typically maintain, particularly when they believe the devices may contain evidence of criminal activity. *See, e.g.*, Exh. J, 30 Ellie Drive FBI Search Records (noting the room and specific location of each cell phone seized from Brayman's home).

3

Mr. Yermolenko submitted a declaration in support of the motion to suppress stating, to the best of his recollection, that the iPhone was seized from his pocket. This recollection is corroborated by health data contained on the iPhone, which reflects that at 6:02 a.m. on December 13, 2022, the iPhone tracked 112 steps. *See* Exh. I, iPhone Activity Sensor Data Report. The iPhone tracked an additional 57 steps at 6:12 a.m., 129 steps at 6:23 a.m., and 38 steps at 6:33 a.m. This is consistent with Mr. Yermolenko walking with the iPhone in his pocket to answer the door, the phone being seized by agents immediately following his arrest, and carried inside the home while the agents conducted the protective sweep for approximately 30 minutes.

There is insufficient space to address each of the factual disputes, but it is clear that an evidentiary hearing is necessary to resolve them.

### III.     The two Samsung cell phones were illegally seized from Mr. Yermolenko's home.

#### a.   The agents lacked authority to enter Mr. Yermolenko's home.

Mr. Yermolenko acknowledges that agents had reason to believe he lived in his home in Upper Saddle River and that he would be present when they executed the arrest warrant. The relevant question is whether law enforcement was authorized to enter his home and conduct a "protective sweep" of all areas of the home *after* executing the arrest warrant outside, based on Mr. Yermolenko's request to use the bathroom and change clothing.

*Barone* answers this question. There, the court specifically found that the FBI's "practice of permitting cooperative arrestees to change clothes prior to their being brought in for processing" after an arrest is complete, as pretext for entering a home and subsequently conducting an unnecessary "protective sweep," "cannot withstand even cursory analysis." *United States v. Barone*, 721 F. Supp. 2d 261, 270 (S.D.N.Y. 2010). The government attempts to distinguish *Barone* by noting that Mr. Yermolenko requested to change clothing. But that does not answer the *Barone* court's express rejection of the FBI's pretextual practice of accommodating such requests to gain warrantless access

4

to an arrestee's home. Indeed, in *United States v. Isiofia*, the court similarly held "the police cannot manufacture the exigent circumstances that form the basis for the protective sweep," particularly where the government controlled the timing of a controlled delivery, did not believe there was anyone else in the apartment, and there was no indication that evidence would imminently be destroyed. *United States v. Isiofia*, No. 02 CR. 520 (HB), 2003 WL 21018853, at *5-6 (S.D.N.Y. May 5, 2003), *aff'd*, 370 F.3d 226 (2d Cir. 2004).

> **b.   Even if the Court were to find the agents had authority to enter the home for Mr. Yermolenko to change clothing, the scope of the "protective sweep" exceeded any limited authority.**

The remaining cases cited by the government in support of the "protective sweep" required to allow an arrestee to change clothing fail to support the agents' expansive search of Mr. Yermolenko's entire home. A protective sweep "may last no longer than is necessary to dispel the reasonable suspicion of danger and in any event no longer than it takes to complete the arrest and depart the premises." *United States v. Moran Vargas*, 376 F.3d 112, 116 (2d Cir. 2004).

As noted in Mr. Yermolenko's original motion, the government has not advanced any "specific, articulable facts giving rise to a reasonable inference of danger" that would support a protective sweep. *See United States v. Miller*, 430 F.3d 93 (2d Cir. 2005). Instead, Mr. Yermolenko told agents that the only people inside the home were his wife and minor children—which the agents likely knew already, given their extensive physical surveillance of the home. *See United States v. Butler*, No. 3:16 CR 123 (AWT), 2017 WL 4150466, at *4 (D. Conn. Sept. 19, 2017).

Not only was the sweep unjustified, it lasted much longer than necessary. The agents did not leave after Mr. Yermolenko's arrest was complete—instead, they remained inside his home for approximately 30 minutes. The government's claim that the protective sweep lasted only 10 minutes begs the question—what were they doing inside Mr. Yermolenko's home for the remaining 20 minutes? The scope of the search, which included not just the master bedroom and hallway leading

5

to it, but also the living room, kitchen, basement, upstairs bedrooms, and garage, far exceeded that of a lawful "protective sweep." *See Kiyuyung*, 171 F.3d at 83 ("protective sweep" authorized was limited to the hallway leading to the bathroom and the bathroom; officers exceeded this authority by looking inside a closet door located along the hallway next to the bathroom). The government repeatedly points to the fact that Mr. Yermolenko was cooperative as justification for the protective sweep. But if anything, this cuts against the need for a protective sweep and undermines any claim that the agents had reasonable suspicion of danger inside the premises. *See Moran Vargas*, 376 F.3d at 116.

All the cases cited by the government share one thing in common: the Court received live testimony at an evidentiary hearing. *See Kiyuyung*, 171 F.3d at 83; *United States v. Murphy*, 16 F. Supp. 2d 397, 399 (S.D.N.Y. 1998); *United States v. Rudaj*, 390 F.Supp.2d 395, 398 (S.D.N.Y. 2005); *United States v. Ivezaj*, 568 F.3d 88 (2d Cir. 2009) (affirming district court's order in *Rudaj* because any error was harmless); *United States v. Smith*, No. 15-cr-466 (ILG), 2016 WL 3144601, at *1 (E.D.N.Y. June 3, 2016). This Court, too, must hold a hearing to resolve significant factual disputes.

**c.  The plain view exception does not apply to the two Samsung cell phones.**

"Under the plain view doctrine, a law enforcement officer may seize evidence without a warrant if (1) the officer is "lawfully in a position from which [the officer] view[s] an object," (2) the object's "incriminating character is immediately apparent," and (3) the officer has "a lawful right of access to the object." *Minnesota v. Dickerson*, 508 U.S. 366, 375 (1993).

First, as discussed above, the agents were not lawfully present in Mr. Yermolenko's home and the government has not established that the two Samsung cell phones were in plain view. One of the Samsung cell phones was located on a desk in an upstairs bedroom—not an area that could have been part of a lawful "protective sweep." *See* ECF No. 143, Exh. A, Declaration of Vadim Yermolenko; Exh. B, 40 Brookside Drive Floorplan. The other cell phone was in the kitchen. Even if the Court were to find the agents could lawfully escort Mr. Yermolenko inside his home to change clothing,

6

unlike in *Rudaj*—where the police discovered guns in a clothing closet—neither Samsung phone was located in the master bedroom or closet, where Mr. Yermolenko's clothing was located. *Id.*

Second, the plain view exception does not apply to the seizure of the two Samsung cell phones because they were not obviously contraband or evidence of a crime. *Kiyuyung*, 171 F.3d at 83. The plain view doctrine can apply to objects which are not in and of themselves contraband, but only if "the incriminating nature of the object is readily apparent or the object is or contains evidence of a crime." *United States v. Delva*, 13 F.Supp.3d 269, 276 (S.D.N.Y. 2014).

The government has not carried its burden of demonstrating that the "incriminating character" of the two Samsung cell phones was "immediately apparent." At most, the government asserts that Mr. Yermolenko affirmatively identified the phones as belonging to him. But "[c]ellphones are 'ubiquitous,'[3] and used for benign and deeply personal purposes just as much as, if not more, for criminal purposes." *United States v. Santos*, No. 23-CR-436 (OEM), 2024 WL 3566983, at \*16 (E.D.N.Y. July 29, 2024); *United States v. Lauria*, 70 F.4th 106, 128 (2d Cir. 2023); *see Carpenter v. United States*, 585 U.S. 296, 311, 320 (2018); *Riley*, 573 U.S. at 396. The government claims that prior to his arrest, "agents had amassed overwhelming evidence demonstrating his use of phones and other electronic devices in furtherance of the crimes he is charged with" and that "the very same probable cause [that] formed the basis of a judicially authorized search warrant with respect to Yermolenko's iCloud account" was sufficient to establish probable cause to seize the two Samsung cell phones.[4]  ECF No. 148 at 52. But these claims seriously misapprehend the probable cause and particularity requirements of the Fourth Amendment's warrant clause. Knowledge that Mr. Yermolenko engaged in online communications,

---

[3] Even more Americans—97%—own cell phones today than in 2014, when *Riley* was decided. *Mobile Phone Ownership*, Pew Research Center (Jan. 31, 2024), https://www.pewresearch.org/internet/fact-sheet/mobile/ (last accessed Sept. 24, 2024). Nine-in-ten people own a smartphone.
[4] To the extent the agents relied upon Mr. Yermolenko's un-*Mirandized* post-arrest statements to develop probable cause, the seizure of the cell phones should be suppressed as fruits of the Fifth Amendment violation.

generally, is insufficient to support probable cause to believe the two Samsung cell phones contained evidence of criminal activity. Emails and WhatsApp can both be used on a computer or tablet and the government has not advanced any more specific information to support probable cause as to these, particular Samsung cell phones.

The government cites two cases to support its argument that the cell phones, despite being neither contraband nor inherently incriminating, were subject to the plain view doctrine. Both cases involved not just lengthy investigations and agent observations supporting probable cause to believe the cell phones contained evidence of criminal activity but, specifically, wiretaps of the defendants' cell phones. *See Kirk Tang Yuk*, 885 F.3d at 80; *United States v. Babilonia*, 854 F.3d 163, 179–80 (2d Cir. 2017). Further, in *Babilonia*, the defendant consented to a search of his home and did not challenge the officers' right to be present in the apartment—he only argued that the ubiquity of cell phones precluded a finding that the incriminating character of the cell phones and tablet was immediately apparent. *Babilonia*, 854 F.3d at 180.

Critically, in both *Kirk Tang Yuk* and *Babilonia*, the Second Circuit only approved the warrantless seizure of cell phones in plain view because the government subsequently obtained valid search warrants **before** they searched the devices. *Kirk Tang Yuk*, 885 F.3d at 80 ("To the extent that modern cell phones present unique Fourth Amendment concerns because of the quality and sensitivity of information they contain, the requirement that law enforcement officials obtain a warrant before they search the contents of a phone—a requirement which, Parrilla admits, the government satisfied here—adequately protects that information."); *Babilonia*, 854 F.3d at 180.

Despite the government's claim that agents had ample probable cause to search the phones, they ignored the Supreme Court's clear directive in *Riley* and get a warrant before searching the phones. This departure from Second Circuit precedent is critical and requires suppression.

**IV.    Mr. Yermolenko's consent to search the three cell phones was not valid because it was tainted by the illegal search and seizure and was not knowing and voluntary.**

      **a.    Mr. Yermolenko's purported consent was not voluntary and was tainted by the agents' illegal search of his home and illegal seizure of the two Samsung phones.**

Mr. Yermolenko's consent to search the three cell phones was tainted by the agents' warrantless search of his home and illegal seizure of the two Samsung phones. The government bears the burden of proving that his subsequent "consent was sufficiently an act of free will to purge the primary taint of the unlawful invasion." *Barone*, 721 F.Supp.2d at 278 (internal quotations omitted). Under *Wong Sun,* the agents' illegal entry and protective sweep invalidates consent unless "the taint of the initial entry had been dissipated before the 'consents' to search were given." *United States v. Oguns,* 921 F.2d 442, 447 (2d Cir. 1990). Although courts sometimes evaluate consent given "following some form of illegal police action" under the "totality of the circumstances" voluntariness test, "evidence obtained by the purported consent should be held admissible only if it is determined that the consent was *both* voluntary and not an exploitation of the prior illegality." *United States v. Isiofia*, No. 02 CR. 520 (HB), 2003 WL 21018853, at *1 n.8 (S.D.N.Y. May 5, 2003), *aff'd*, 370 F.3d 226 (2d Cir. 2004) (quoting 3 Wayne R. LaFave, Search and Seizure: A Treatise on the Fourth Amendment § 8.2(d), at 655–66 (3d ed.1996)); *United States v. Goodrich*, 183 F. Supp. 2d 135, 145 (D. Mass. 2001). In addition to excluding tangible materials seized during an unlawful search, "the exclusionary rule also prohibits the introduction of derivative evidence, both tangible and testimonial, that is the product of the primary evidence, or that is otherwise acquired as an indirect result of the unlawful search, up to the point at which the connection with the unlawful search becomes 'so attenuated as to dissipate the taint.'" *Isiofia*, 2003 WL 21018853, *5 (citing *Murray v. United States,* 487 U.S. 533, 537–38 (1988)); *Rozzo v. State*, 75 So. 3d 409, 415 (Fla. Dist. Ct. App. 2011) ("Because the 'protective sweep' was an unreasonable warrantless entry into the Rozzo home, the father's subsequent consent to the search of the home was presumptively tainted.").

The government's extraction of Mr. Yermolenko's verbal consent to search the illegally seized cell phones within the 30 minutes they were inside his home and immediately following the protective

sweep only reduces the attenuation between the illegal police conduct and the consent. *Id.* at *6 (holding taint did not dissipate from first consent to search where *Miranda* warnings preceded the defendant's subsequent signature of two consent-to-search forms); *Butler*, 2017 WL 4150466, *5-6. The temporal proximity between the initial purported "consent" and the "harrowing[] series of events" culminating in the illegal search and seizure of the cell phones also weighs against a finding of voluntariness. *Isiofia*, 2003 WL 21018853, *8 (noting that "[a]n unconstitutional entry and search weighs heavily in the calculus of the objective reasonableness of the defendant's consent"); *see also United States v. Palomino-Chavez*, 761 F. App'x 637, 644 (7th Cir. 2019) ("Generally, the illegal seizure of a suspect will vitiate the suspect's subsequent consent to a search unless the state proves that the consent resulted from an independent act of free will.") (internal quotations omitted).

Further, despite the passage of time during transport to the interrogation room, the agent grounded the consent to search form in Mr. Yermolenko's purported initial consent, immediately following the illegal seizure: "[S]o, just right there, the three phones, if you could just sign here that you told us that in the house and that you agree with that." Exh. F, Post-Arrest Recording at 1:15-1:42. Rather than purge the taint of the illegal search and seizure, the agent's comment amplified it— because he previously "consented," Mr. Yermolenko was subsequently *required* to "agree." *C.f. Missouri v. Seibert*, 542 U.S. 600, 608 (2004).

### b.  The forensic search of the cell phones exceeded the scope of any consent.

A signature on a written consent form is not dispositive of voluntary consent. *See United States v. Parson*, 599 F. Supp. 2d 592, 608 (W.D. Pa. 2009) (citing *Ferguson v. City of Charleston*, 532 U.S. 67 (2001)). This is particularly true where "the form itself is generic and vague." *Id.* at 608, n. 10 ("The form is disturbingly bare, failing to even state such essentials as the purpose of the search."). "The scope of the suspect's consent is a question of fact, and '[t]he government has the burden of proving, by a preponderance of the evidence, that a consent to search was voluntary.'" *United States v. Gandia*, 424 F.3d 255, 265 (2d Cir. 2005).

10

Mr. Yermolenko does not dispute that he speaks and reads English and was provided a written consent to search form. However, the boilerplate text of that form, combined with the agents' contextual comments when they presented the form, failed to inform Mr. Yermolenko of the scope of the consent his signature on the paper carried. The pre-printed consent to search form not only authorized the "complete search" of [BLANK], which the agents filled in with "(3) phones," it also stated: "I authorize these agents to take **any items** which they determine may be related to their investigation." The agents described this significant rights forfeiture as "just also administrative just to get this out of the way so we can start talking openly, freely about things."

The touchstone of the Fourth Amendment is reasonableness, and presenting such an absurdly expansive form to an arrestee as "just also administrative, just to get this out of the way" is patently unreasonable. Contrary to the form's statement, "I have been advised of my right to refuse consent," the agents said nothing to that effect. Nor did they ever confirm his understanding of this right. But because he signed the paper during the course of a less than 30 second exchange, the government would claim he voluntarily agreed that the agents had *carte blanche* for an exploratory rummaging. Such a result would extend the consent search doctrine to an unreasonable extreme.

The government argues that Mr. Yermolenko's consent to a "complete search" of the three cell phones was knowing and voluntary because he "previously worked in mobile smartphone sales and thus was not ignorant to their complexities, understood the scope of his consent and provided it willingly." ECF No. 148 at 58. But as the government acknowledges, the standard for measuring the scope of consent under the Fourth Amendment is "objective" reasonableness—what would "the typical reasonable person have understood by the exchange between the officer and the suspect?" *Id.* (quoting *Florida v. Jimeno*, 500 U.S. 248, 250-51 (1990)). Notably, the agents had the three cell phones in the interrogation room, asked for the passcodes to access the phones, and reviewed the phones and

asked Mr. Yermolenko questions about them during the course of the interview. The agents did not

at any point mention any sort of forensic review of the cell phones.

Again, the government bears the burden of showing that the warrantless forensic search of

the cell phones—the type of search *Riley* made clear requires a warrant—was justified by an exception

to the Fourth Amendment's warrant requirement. Mr. Yermolenko's boilerplate consent, obtained as

an "administrative" formality, falls far short.

V.   **The inevitable discovery doctrine does not apply because the scope of the consent search far exceeded any probable cause supporting a hypothetical search warrant that the government declined to obtain**.

The inevitable discovery doctrine is not a magic wand the government can wave whenever

their agents violate the Fourth Amendment. The government must prove by a preponderance of the

evidence that the fruits of an illegal search or seizure "would have been obtained inevitably without

the constitutional violation." *United States v. Stokes*, 733 F.3d 438, 444 (2d Cir. 2013) (quoting *United*

*States v. Heath*, 455 F.3d 52, 55 (2d Cir. 2006)). Proof of inevitable discovery "involves no speculative

elements but focuses on *demonstrated historical facts capable of ready verification or impeachment*." *Id.* (quoting

*United States v. Eng*, 971 F.2d 854, 859 (2d Cir. 1992)) (emphasis added). Evidence should not be

admitted, therefore, unless a court "can find, with a high level of confidence, that *each* of the

contingencies necessary to the legal discovery of the contested evidence would be resolved in the

government's favor." *Id.* (emphasis added); *Eng*, 971 F.2d at 859 ("Under the inevitable discovery

exception, unlawfully seized evidence is admissible if there is *no doubt* that the police would have

lawfully discovered the evidence later.").

In *Stokes*, government agents made a "deliberate, tactical choice" to arrest Stokes without an

warrant so that officers could question him outside the presence of counsel. Here, in stark contrast to

the warrants sought and obtained for the search of co-defendant Brayman's home, *see* ECF No. 143,

Exh. H, the government made a "deliberate, tactical choice" not to seek a search warrant for Mr.

Yermolenko's home or cell phones. That is because a search warrant must be carefully tailored and particularized. The generalized consent form the agents presented to Mr. Yermolenko as "administrative" paperwork is not.

The government claims that it is a foregone conclusion that a magistrate would have signed off on a warrant for Mr. Yermolenko's cell phones. But the government never obtained a warrant. In *United States v. Cabassa*, 62 F.3d 470, 472-73 (2d Cir. 1995), the Second Circuit reversed where agents were in the process of seeking but had not yet obtained a search warrant before officers executed a search of a home. The Second Circuit found that there were a number of contingencies that precluded application of the inevitable discovery doctrine, including a "residual possibility that a magistrate would have required a stronger showing of probable cause," that it was impossible to determine with "any certainty how much time would it have been taken to complete the application, to submit it to the magistrate judge for consideration, and to secure the warrant's issuance," and that the evidence might have disappeared before the warrant was issued. *Id.*

There is a reason the Fourth Amendment requires the issuance of a warrant upon the determination of probable cause by a neutral and detached magistrate: to protect the people from government overreach. Permitting the government to admit evidence that was obtained through illegal search and seizure based on a hypothetical warrant would permit the government to circumvent the Fourth Amendment. The Court should decline to do so here.

**VI.    Mr. Yermolenko's post-arrest statements should be suppressed.**

Mr. Yermolenko's motion to suppress includes two separate categories of statements: (1) statements made after he was arrested outside his home and before he was presented with the *Miranda* waiver form, and (2) statements made after he signed the *Miranda* waiver form.

The government claims that no substantive statements were made pre-*Miranda*. But it is clear, from the statements made by the agents during the recorded interrogation, that agents asked Mr.

Yermolenko questions about the ownership and use of the illegally seized cell phones, his time living in Russia, his cell phone business, and his family. The Court should suppress all pre-*Miranda* statements.

Additionally, his post-*Miranda* statements must be suppressed because the agents unlawfully minimized his Fifth Amendment rights to secure a waiver and because they were tainted by his earlier, un-*Mirandized* statements *See Seibert*, 542 U.S. at 621. "A police officer cannot directly contradict, out of one side of his mouth, the *Miranda* warnings just given out of the other." *State v. O.D.A.-C.*, 250 N.J. 408, 421, 273 A.3d 413, 420–21 (2022) (internal citation omitted). Referring to *Miranda* warnings as a "formality" trivializes their significance. *Doody v. Ryan*, 649 F.3d 986, 1002-03 (9th Cir. 2011) (en banc). *Miranda* warnings are a constitutional requirement meant to protect a person's rights under the Fifth Amendment; they are not a formality. To describe them that way undermines "the very purpose of *Miranda*." *Ross v. State*, 45 So. 3d 403, 428-30 (Fla. 2010) (criticizing a reference to the warnings as "just a matter of procedure").

The agents presented the *Miranda* waiver form as just another piece of administrative paperwork, intentionally minimizing and misrepresenting the purpose and significance of signing the waiver form. The agents did not read, explain, or confirm Mr. Yermolenko's understanding of the rights set forth on the waiver form. Considering the totality of the circumstances including, as discussed at length above, the agents' repeated violations of Mr. Yermolenko's constitutional rights before the *Miranda* waiver form was presented, his waiver was not voluntary.

The government bears the burden of proving that law enforcement did *not* deliberately engage in a two-step interrogation strategy. *United States v. Capers*, 627 F.3d 470, 479 (2d Cir. 2010) (finding government failed to prove postal inspector did *not* use deliberate two-step interrogation tactic); *see also United States v. Stewart,* 536 F.3d 714, 719 (7th Cir. 2008). Five objective factors to be weighed when analyzing the effectiveness of the warning include: (1) "the completeness and detail of the questions

14

and answers in the first round of interrogation," (2) "the overlapping content of the two statements," (3) "the timing and setting of the first and second" interrogation, (4) "the continuity of police personnel," and (5) "the degree to which the interrogator's questions treated the second round as continuous with the first." *Seibert*, 542 U.S. at 615. *See also Capers* at 478 (considering the last four factors). Three of the armed agents who executed Mr. Yermolenko's arrest, illegally searched his home, illegally seized the cell phones, and extracted his initial purported "consent" also participated in his recorded interrogation. Additionally, the agents repeatedly referred to his pre-*Miranda* statements—including the initial consent—throughout the interrogation. These facts, in particular, weigh in favor of a finding that the agents deliberately engaged in a two-step interrogation strategy.

### VII.   The government fails to address the iCloud warrant's fatal overbreadth and lack of particularity, which a reasonable agent could not have relied upon in good faith.

The government responds to Mr. Yermolenko's motion with the same generalizations that rendered the iCloud warrant fatally overbroad and unparticularized: that because Mr. Yermolenko engaged in "communications" and there was probable cause to believe he committed specific offenses, the probable cause existed to search his entire iCloud account. ECF No. 148 at 65.

The government fails to address the warrant application's reference to unrelated defendants charged in an entirely separate case. Indeed, the government claims "there is no basis to conclude that the agents who sought and executed the Warrant knew or should have known that it contained any defect." But that is a remarkable defect to overlook, in addition to the extremely overbroad request for categories of information that are not supported by the limited probable cause set forth in the affidavit. No reasonable agent could have objectively relied upon the warrant in good faith.

The government claims the defense "confuses Apple's production of the entire account with the government's seizure of specific evidence." To the contrary, Mr. Yermolenko objects to the "two-step" process authorized by Attachment B of the search warrant. The warrant requiring Apple to turn over virtually unlimited information from Mr. Yermolenko's iCloud account was a seizure by the

15

government—once Apple turned over that information, the government had seized it, under any logical meaning of the word "seizure."[5]

Blanket seizure of electronic data was previously justified under the rationale that it was impractical to search the internal storage or hard drive of a computer or cell phone on-site. *See, e.g.*, *United States v. Hill*, 459 F.3d 966, 974-75 (9th Cir. 2006); *Guest v. Leis*, 255 F.3d 325, 334-35 (6th Cir. 2001). However, this concern is not applicable here because the forensic investigative search of iCloud account data never occurs on-site and does not require the search of physical devices.

In *United States v. Shipp*, a warrant authorizing the search of a defendant's entire Facebook account lacked particularity because the format of the warrant enumerated a "list of sixteen different categories of information associated with the account," demonstrating that the "[w]arrant could have been more clearly defined by its object . . . and limited to the categories of information associated with the Facebook account in which there was probable cause to believe that such evidence might be found." 392 F.Supp.3d 300, 311 (E.D.N.Y. 2019). *See also United States v. Galpin*, 720 F.3d 436, 451-52 (2d Cir. 2013) (noting that there was little evidence that the search at issue was "directed—much less properly limited—to those files that would substantiate [the charged crime]," and remanding to "determine whether a search limited to evidence of a registration violation would have necessitated the opening of image files or the playing of video files"). Like the warrant in *Shipp*, the format of the warrant shows that the government could have narrowed the scope ***before*** receiving the information from Apple. *See* Exh. G, iCloud Search Warrant and Affidavit, Attachment B, Section I. Despite defense discovery requests, the government has not produced any materials documenting how the search was executed or pointed to any precautions taken by government agents to restrict the materials reviewed to the limited categories and temporal range for which the government had probable cause.

---

[5] *See* Orin S. Kerr, *Fourth Amendment Seizures of Computer Data*, 119 Yale L.J. 700 (2010) (concluding that copying data "seizes" it under the Fourth Amendment).

This is impermissible, particularly given the widespread capabilities of Mobile Device Forensic Tools (MDFTs) such as Cellebrite, which allow officers to conduct narrow searches of metadata without actually viewing nonresponsive files.[6]

The warrant itself and the execution of the warrant both violated the Fourth Amendment.

## VIII.   CONCLUSION

For the foregoing reasons, the Court should hold an evidentiary hearing to resolve the factual disputes material to suppression of the cell phone and statement evidence. Additionally, the Court should suppress the evidence seized pursuant to the overbroad and unparticularized iCloud warrant.

Respectfully Submitted,

*/s/ Nora K. Hirozawa*
Nora K. Hirozawa
Earl Kirkland
James Darrow
Counsel to Vadim Yermolenko
Federal Defenders of New York, Inc.

cc:     AUSA Artie McConnell
        AUSA Craig Heeren
        AUSA Matthew Skurnik
        AUSA Andrew Reich

---

[6] *See* Logan Koepke, et. al., *Mass Extraction: The Widespread Power of U.S. Law Enforcement to Search Mobile Phones*, Upturn Toward Justice in Technology, October 2020.